IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:21-MJ-1080-RJ

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOVELLE BONITA CABIDA,<br><br>Defendant. | JUDGMENT |

This matter comes before the court for its judgment following Defendant's non-jury trial before the undersigned on November 10, 2021. For the reasons stated below, Defendant is found guilty.

## I. PROCEDURAL BACKGROUND

This case arises from a traffic stop and subsequent arrest of Defendant on February 28, 2021 on Marine Corps Base Camp Lejeune, a place within the special maritime jurisdiction of the United States, for Driving While Impaired ("DWI"). [DE-1]. On March 11, 2021, the government filed a criminal information, [DE-1], charging Defendant with violating N.C. Gen. Stat. § 20-138.1, as assimilated by the provisions of Title 18 U.S.C. § 13. Defendant's initial appearance and arraignment were held on March 18, 2021. Defendant consented to trial, judgment, and sentencing before a United States Magistrate Judge. [DE-14]. The undersigned presided over a non-jury trial on November 10, 2021. [DE-20]. At trial, three witnesses testified on behalf of the government. The government submitted one exhibit, [Gov't Ex. 1], which was accepted into evidence without objection. Defendant and three other witnesses testified on behalf of Defendant.

## II. FACTUAL BACKGROUND

The factual basis is elicited from testimony at trial. Military Police Officer Amin Lopez

("Lopez") testified that he was patrolling Camp Lejeune in the early morning hours of Sunday February 28, 2021. Audio Tr. at 10:38:15–28. Officer Lopez testified that he had turned his patrol car left from Brewster Boulevard onto Holcomb Boulevard. *Id.* at 10:39:48–52. Lopez was driving north in the outbound direction from the base, in the inside, outbound lane. The route of Holcomb Boulevard, from Brewster Boulevard until the gate, is a divided highway, with three outbound lanes proceeding North and three inbound lanes proceeding South. The outbound and inbound lanes are divided by a grass median. As Lopez was headed outbound in his patrol car, he saw headlights pointing directly at him, and determined that a vehicle was driving the "wrong way" on the inside outbound lane. *Id.* at 10:40:00–10:42:08. Lopez testified that he had to swerve to the right lane to avoid a collision, and that the vehicles passed at two to three car-lengths, while driving around twenty-five to thirty miles per hour, which is within the speed limit. *Id.* at 10:42:08–46.

Officer Lopez then made a "U-turn," activated his blue lights to conduct a traffic stop, and radioed for dispatch that he was stopping a vehicle on Holcomb Boulevard. Lopez testified that the car stopped in the inside outbound lane soon after he activated his lights, and he exited his vehicle and approached the driver at approximately 1:30 a.m. *Id.* at 10:43:08–10:44:05. Both vehicles were facing inbound, in the inside, outbound lane. As Lopez approached Defendant's vehicle, he testified that he smelled the odor of alcohol as he passed the rear of the driver-side door. *Id.* at 10:44:24–42. Upon making contact with the Defendant, Officer Lopez testified that Defendant's eyes were red and glassy. He said that Defendant's speech was slurred when he asked why Defendant was driving the in the wrong direction. *Id.* at 10:45:24–27. Lopez requested a patrol unit from dispatch upon determining a possible impaired driver, as Lopez's current role was as a supervisor. Lopez also contacted the gate sentry and determined that no vehicle had entered

2

the base travelling in the wrong direction. *Id.* at 10:47:50–20:48:15. On cross-examination, Lopez stated that he did not recall Defendant telling him anything about her Global Positioning System ("GPS"). *Id.* at 10:50:03–32.

Military Police Officer Nicholas Hermann ("Hermann") responded to Lopez's call. Hermann, upon walking up to Defendant's vehicle, likewise testified he observed Defendant's bloodshot and watery eyes, slurred speech, and the odor of alcohol. *Id.* at 10:57:00–09. Hermann testified that he did not perform "pre-exit" impairment tests. He testified that Defendant admitted that she did not usually travel through the Holcomb Gate and had decided to make a U-turn to go to the Wilson Gate, another point of entry aboard Camp Lejeune. Defendant told Hermann further that she and some friends had been bowling, then went to a friend's barracks room, and that then she had attempted to drive home. *Id.* at 10:57:34–10:58:54. Hermann stated that he then had Defendant exit the vehicle based on the odor of alcohol and other signs of impairment in order to conduct the standard field sobriety tests ("SFSTs").

Herman performed the SFSTs based on his National Highway Traffic Safety Administration ("NHTSA") training. *Id.* at 11:00:00–17. He started with the Horizontal Gaze Nystagmus ("HGN") test. There, Defendant exhibited all six clues. *Id.* at 11:02:34–39. Hermann then conducted the walk-and-turn test. There, Defendant exhibited two of eight clues of impairment. She did not correctly step on every step, by putting the heel of one foot to the toe of the other. She did not correctly turn. A proper turn should entail keeping the front foot on the line and turning by taking a series of small steps while keeping the front foot on the ground. Defendant, however, stood on both toes and rotated her body in one movement. *Id.* at 11:04:44–11:05:07. Hermann testified that he demonstrated how to step and turn, and that Defendant had no questions about the test. *Id.* at 11:03:40–11:04:12. Hermann next had Defendant perform the one-leg-stand

3

test. There, Defendant exhibited one clue twice, out of four total, as she put her foot down two times, instead of holding her foot six inches off the ground. *Id.* at 11:05:14–48. Officer Hermann then determined Defendant had exhibited sufficient signs of impairment and took Defendant into custody at the Provost Marshal Office ("PMO").

At the PMO, Defendant was advised of her *Miranda* rights, which she waived. Hermann asked Defendant to answer the questions on DD Form 1920, Government's Exhibit 1, which Hermann filled out as Defendant answered the questions, at 2:16 a.m. on February 28, 2021. There, Defendant admitted that she had consumed alcohol. *Id.* at 11:07:06–56; *see* Gov't Ex. 1. She said that she had consumed "Jello-shots" while at the bowling alley. Defendant also reported to Hermann she last ate earlier that evening (Saturday, February 27, 2021), and that she was currently under the influence of alcohol. Audio Tr. at 11:09:39–11:10:20; *see* Gov't Ex. 1. Defendant then underwent a thirty-minute observation period before intoxication screening. On cross-examination, Hermann testified that Defendant showed him her GPS device, and that Defendant told Hermann that the GPS had directed her to the Holcomb Gate and then told her to make a U-turn. Audio Tr. at 11:13:40–11:14:02. Hermann also testified that Defendant had told him that she only had five hours of sleep the previous night. *Id.* at 11:16:41–49.

Officer Kamil Keilb ("Keilb"), a Department of Defense traffic investigator next testified regarding the test he conducted on Defendant with the Intoximeter ECIR II instrument. Keilb testified that he was certified in using the instrument, and that he was on duty on the night in question. *Id.* at 11:19:00–29. Keilb stated that Defendant's eyes were bloodshot, and also "teary," but he also noted that Defendant was extremely polite at all times. *Id.* at 11:20:15–26. Defendant was informed of her chemical testing rights—her right to have an attorney or witness present, with a thirty-minute waiting period, but Defendant did not call anyone. *Id.* at 11:20:49–11:21:39. The

4

rules of implied consent regarding the test were read to Defendant. Keilb testified that Defendant asked no questions about the Intoximeter, and that she indicated she understood Keilb's instructions and his demonstration on the equipment to provide a breath sample. *Id.* at 11:22:02–42. When Defendant performed on the Intoximeter she first puffed into the instrument, stopped, and puffed again, which was insufficient to provide a sample. *Id.* at 11:22:44–55. The instrument eventually timed out, and Keilb testified that when he asked Defendant to provide another sample, she seemed confused. *Id.* at 11:22:55–11:23:08. Keilb then read the instructions to Defendant again, but Defendant did not perform the test, and the instrument timed out again. Keilb again asked Defendant to provide a sample, but Defendant would not attempt to provide one. Keilb informed Defendant that refusing to blow into the instrument would mean that her driver's license would be suspended. Defendant told Keilb that said she understood. When Keilb asked Defendant again if she wanted to provide a sample, Defendant shook her head, indicating "no." *Id.* at 11:23:23–55. Keilb testified that Defendant did not inform him of any medical condition that she may have. *Id.* at 11:23:58–11:25:23. Keilb also testified that providing a breath sample is not difficult, that people with chronic obstructive pulmonary disease ("COPD"), Pulmonary Fibrosis, and severe asthma should not have a problem, and that he can provide a sample, despite his having COPD and asthma. *Id.* at 11:25:32–47. On cross examination, Keilb testified that it was possible that certain conditions could interfere with collecting a breath sample, but that Defendant did not seem to be out of breath or to have difficulty breathing. *Id.* at 11:26:06–53.

Defendant testified that she was born in the Philippines and came to the United States at age 18. She testified that English is her second language. *Id.* at 11:32:56–11:33:18. Defendant is now 31 years old and is married to United States Marine Sergeant Jacob Jines. At the time of the incident, she worked as a gas station cashier. Defendant testified that on the night in question she

5

drove to the bowling alley located on base around 6 p.m. on Saturday February 27, 2021, to meet with friends—Waranut Fidler and Thakorlate Dunlap, who are sisters—and Dunlap's boyfriend. *Id.* at 11:35:10–29. Defendant testified that she believed she had consumed 4 "Jello-shots" from 6 p.m. until 8:36 p.m. *Id.* at 11:35:58–11:36:30. Around 9 p.m., the group went to Dunlap's boyfriend's room located in the barracks. Defendant left her car at the bowling alley, and one of the friends was the "designated driver." Defendant testified that while in the barracks they ate pizza, watched a movie, but did not drink any more alcohol. *Id.* at 11:37:18–11:38:19.

Defendant testified that after the movie she got a ride back to the bowling alley and started to drive home around 1:00 a.m. She said that she was not familiar with Camp Lejeune, and relied on her phone's GPS for directions off the base. *Id.* at 11:38:18–48. Defendant testified that she turned on her GPS to direct her home, since she did not know where she was going. *Id.* at 11:39:00–11:40:22. She stated that as she was approaching the gate, she did not recognize it, and did not realize it was open. According to Defendant, her GPS indicated to make a left turn, so she made a U-turn. *Id.* Defendant testified that when she saw the "blue lights," she stopped. Defendant said that she did not speak to Officer Lopez, but did speak to Officer Hermann, and that she told him that she was just "following the GPS." *Id.* at 11:40:24–58. Defendant said that she sometimes could not understand the officers because they spoke too quickly. *Id.* at 11:41:49–11:42:08. She also testified that she has been diagnosed with asthma, and has two inhalers which she uses every day. *Id.* at 11:42:31–55. In regard to the breath test, Defendant testified that she told officers that she had asthma, and that they told her to blow as hard as she could. Defendant testified that she tried to blow into the instrument four times, and did not decline to blow into the Intoximeter. *Id.* at 11:43:07–11:44:15.

On cross-examination, Defendant testified that she lived in Piney Green, a residential area

6

near Camp Lejeune. Defendant said she was not aware that Piney Green was closer to the Holcomb Gate than the Wilson Gate. *Id.* at 11:45:24–11:46:41. Defendant testified no one consumed alcohol in her car, and no alcohol had spilled in her car. *Id.* at 11:47:27–44. She said she and her friends did not consume alcohol in the barracks. Defendant testified that she did not know why the officer would have written in the report "macaroni" as the last thing she ate, as opposed to pizza. *Id.* at 11:48:35–42; s*ee* Gov't Ex. 1. Defendant said that she did not notice the road signs, that she was just following her GPS, and that she decided to make a U-turn before the gate when her "GPS turned left." Audio Tr. at 11:51:02–11:52:08. Defendant also testified that she never saw headlights coming at her after making a U-turn, and that she never had a near miss with another vehicle. *Id.* at 11:52:50–11:54:28.

Sergeant Jines, Defendant's husband, testified that he and Defendant had moved to the area in December of 2020. *Id.* at 11:55:53–11:56:03. He was not with Defendant on the night in question. He said that he started to worry about her as it got late in the evening, so he used his phone and located Defendant at the PMO. *Id.* at 11:57:15–41. After calling the PMO, Sgt. Jines went to the PMO around 2:00 or 2:30 a.m. Jines testified that Defendant looked embarrassed, like she was in trouble, but did not look intoxicated. He further stated that when they left the PMO, around 3:30 a.m., that Defendant appeared to walk normally, and that she told him she had attempted to blow into the Intoximeter four times. *Id.* at 11:58:00–12:00:12.

Waranut Fidler, a friend of Defendant's who was with Defendant on the evening of Saturday, February 27, 2021, testified that the group met at the bowling alley, and that they consumed Jello-shots. *Id.* at 12:02:55–12:03:12. She further stated that there was no alcohol consumed in the barracks, and that she thought they ate pizza. When asked about driving back to the bowling alley, Fidler said she did not understand. On cross-examination, when asked if any

7

wine was consumed in the barracks, Fidler said she did not understand. *Id.* at 12:04:20–34.

Thakorlate Dunlap next testified that the group went to her boyfriend's room in the barracks after bowling. She stated that in the barracks they ate pizza and did not drink any alcohol. *Id.* at 12:05:43–12:06:08. After the movie, Dunlap took Defendant back to the bowling alley around 1:00 a.m. Dunlap testified that Defendant looked "really sleepy," but talked and walked "fine." *Id.* at 12:06:29–45. On cross-examination, Dunlap testified that Defendant had told her she had consumed four Jello-shots. *Id.* at 12:06:51–12:07:09.

## III. DISCUSSION

### A. Overview of Charged Offense

The North Carolina General Statutes provide in relevant part that "[a] person commits the offense of impaired driving if he drives any vehicle upon any highway, any street, or any public vehicular area within the State . . . [w]hile under the influence of an impairing substance; or . . . has, at any relevant time after the driving, an alcohol concentration of 0.08 or more . . . or [has] any amount of a Schedule I controlled substance . . . in his blood or urine." N.C. Gen. Stat. § 20-138.1(a). An impairing substance includes alcohol. N.C. Gen. Stat. § 20–4.01(14a). "A person is under the influence of an impairing substance when he has taken (or consumed) a sufficient quantity of that impairing substance to cause him to lose the normal control of his bodily or mental faculties, or both, to such an extent that there is an appreciable impairment of either or both of these faculties. N.C.P.I.-Crim. 270.20; *see also* N.C. Gen. Stat. § 20–4.01(48b) (defining "under the influence of an impairing substance" as "[t]he state of a person having his physical or mental faculties, or both, appreciably impaired by an impairing substance"); *United States v. Naallah*, No. 5:15-MJ-01016-RN, 2016 WL 1267164, at *3 (E.D.N.C. Mar. 31, 2016).

In order to be found guilty of this offense in the present context, the government must

8

establish each of the following three elements beyond a reasonable doubt: (1) that defendant was driving a vehicle; (2) that she was driving that vehicle upon a street, highway, or public vehicular area, an area in North Carolina within the special maritime and territorial jurisdiction of the United States; and (3) that at the time defendant satisfies one of the alternatives of driving the vehicle while she was under the influence of an impairing substance or had an alcohol concentration of 0.08 or more at any relevant time or any amount of a Schedule I controlled substance in her blood or urine. *See* N.C. Gen. Stat. § 20-138.1(a); N.C. Pat. Jury Inst. Crim. 270.20A; *see also* 18 U.S.C. § 13(a); *United States v. Muleshe*, No. 5:15-MJ-01409-RN-1, 2016 WL 4742267, at *5 (E.D.N.C. Sept. 12, 2016). The first two elements are not in dispute and appear supported by the evidence. Defendant denies, however, that the third element is satisfied because she was not appreciably impaired.

## B. Discussion of Admissible Evidence Presented at Trial

The Government points to Defendant's poor driving and other evidence of impairment. Defendant counters that there was no appreciable impairment, especially without chemical analysis, and that Defendant did not in fact refuse to blow into the Intoximeter. According to Defendant, her poor driving can be explained by Defendant's being new to the area.

"The fact that a motorist has been drinking, when considered in connection with faulty driving or other conduct indicating an impairment of physical and mental faculties, is sufficient prima facie" evidence to show appreciable impairment. *United States v. Mason*, No. 5:15-MJ-01668-RN, 2016 WL 1337249, at *3 (E.D.N.C. Apr. 5, 2016) (quoting *State v. Norton*, 231 N.C. App. 75, 79, 712 S.E.2d 387, 390 (2011) (internal quotation marks omitted); *State v. Coffey*, 189 N.C. App. 382, 387, 658 S.E.2d 73, 76 (2008)). Alternatively, a driver will also be found guilty of DWI if they drive on public roads "[a]fter having consumed sufficient alcohol that [they have], at

9

any relevant time after the driving, an alcohol concentration of .08 or more." *Mason*, 2016 WL 1337249, at *3; N.C. Gen. Stat. § 20-138.1.

Non-chemical evidence of impairment often includes a defendant's poor driving, an odor of alcohol, bloodshot, watery, and/or glassy eyes, slurred speech, failing to follow an officer's instructions, being unsteady on their feet, moving sluggishly, admissions of drinking, and poor performance on SFSTs. Additionally, a defendant's refusal to "submit a breath sample for a breathalyzer test . . . is substantive evidence of driving while impaired," *United States v. Van Hazel*, 468 F. Supp. 2d 792, 798 (E.D.N.C. 2006), but a refusal "is only one piece of evidence and it is not given more weight than other pieces of evidence." *Muleshe*, 2016 WL 4742267, at *5 (citing *United States v. Rios*, No. 5:12-MJ-01742-JG-1, 2013 WL 3776474, at *3 (E.D.N.C. July 17, 2013) ("This evidence [of defendant's refusal to submit to an intoxilyzer test], together with the other evidence . . . establishes beyond a reasonable doubt that [defendant] drove while under the influence of alcohol, an impairing substance.")). The court has also found that providing an insufficient breath sample may be considered a refusal. *Naallah*, 2016 WL 1267164, at *2–3 (finding defendant's four insufficient attempts to provide a breath sample constituted a refusal). North Carolina courts have found that the refusal to provide a breath sample does not have to be willful. *State v. Pyatt*, 125 N.C. App. 147, 151, 479 S.E.2d 218, 220 (1997).

The court has previously held that the HGN test, is a scientific test requiring expert testimony and compliance with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Company v. Carmichael*, 526 U.S. 137 (1999). *Van Hazel*, 468 F. Supp. 2d at 798 ("[A]ny testimony regarding the HGN test would be scientific testimony which is subject to Federal Rule of Evidence 702 and the standards established in *Daubert*."). Accordingly, before the court may consider results from an HGN test, the Government must "produce sufficient

evidence of the reliability of the HGN test (including the correlation between nystagmus and intoxication)." *Id.* at 797; *Muleshe*, 2016 WL 4742267, at *3; *United States v. Rowland*, No. 7:18-MJ-1124-RJ, 2018 WL 6683305, at *2 (E.D.N.C. Dec. 19, 2018) ("Like the officers in *Van Hazel* and *Muleshe*, Officer McCaulley is well versed in the administration of the HGN test, but his testimony does not establish the scientific reliability of the test."). In the present case, because the Government did not introduce an expert witness for the reliability of the test, the HGN test evidence may not be considered.

The admissible evidence shows beyond a reasonable doubt that Defendant was driving while under the influence of alcohol based on the following: (1) Defendant driving her vehicle in the wrong direction on Holcomb Boulevard; (2) her bloodshot, watery, and glassy eyes; (3) the odor of alcohol emanating from her vehicle; (4) her slurred speech; (5) her admission that she had consumed alcohol that evening; (6) her refusal to provide an adequate breath sample; (7) her exhibiting two clues on the walk-and-turn test; and (8) her exhibiting one clue, twice, on the one-leg-stand test. For these reasons, the undersigned concludes that the government met its burden of proving beyond a reasonable doubt that Defendant violated N.C. Gen. Stat. § 20-138.1.

Defendant drove her vehicle in the wrong direction on Holcomb Boulevard. Officer Lopez's testimony, as does Officer Hermann's, supports this finding. Audio Tr. at 10:40:00–10:44:05, 10:57:00–10:58:54.

That Defendant and Officer Lopez had a near collision while traveling in opposite directions on Holcomb Boulevard seems to be disputed. Officer Lopez testified that he and Defendant almost collided when traveling in opposite directions on the outbound lanes of Holcomb Boulevard. Lopez said that shortly after turning on Holcomb Boulevard and traveling in the inside "fast lane," in the outbound direction, he saw headlights pointing directly at him, and determined

11

a vehicle was driving the "wrong way" in his lane. Audio Tr. at 10:40:00–10:42:08. Lopez testified that he had to swerve to the right lane to avoid collision. *Id.* at 10:42:08–46. However, Defendant testified that she never saw headlights coming at her after making a U-turn at the gate. *Id.* at 11:52:50–11:54:28. She testified she never had a near miss with another vehicle. *Id.*

Officer Lopez's testimony that Defendant drove the wrong way is corroborated by Officer Hermann's DD 1920 form, [Gov't Ex. 1], which was completed on the night of the incident, and also by Hermann's testimony at trial. Audio Tr. at 10:55:55–10:56:38. In regards to the near collision, however, the court finds Officer Lopez's testimony more credible—his having to swerve to avoid Defendant's vehicle while Defendant was driving the "wrong way" in the inside, outbound lane of Holcomb Blvd—largely due to the greater detail of Officer Lopez's testimony. Furthermore, Defendant's contention that she was simply following her GPS instructions to the exclusion of her surroundings, including on-coming traffic, does not seem plausible.

Defendant's eyes were bloodshot, watery, and glassy. Testimony also supports this finding. Officer Lopez testified to Defendant's eyes being red and glassy upon stopping Defendant's vehicle. *Id.* at 10:45:24–27. Officer Hermann testified that upon his arrival at the scene, Defendant's eyes were bloodshot and watery. *Id.* at 10:57:00–09. Finally, Officer Keilb, observed Defendant later in the evening at the PMO, and testified as to Defendant's eyes being bloodshot. *Id.* at 10:20:15–26.

The odor of alcohol emanated from Defendant's car. Lopez testified that he smelled the odor of alcohol as he walked past the rear of the driver-side door of Defendant's vehicle. *Id.* at 10:44:24–42. Hermann likewise testified as to smelling the odor of alcohol upon speaking to Defendant during the traffic stop. *Id.* at 10:57:00–09. Additionally, Defendant testified that no one consumed alcohol in her vehicle, and no alcohol had spilled in her vehicle. *Id.* at 11:47:27–

12

44.

On the night in question, Defendant's speech was slurred. Officer Lopez testified that when he stopped Defendant, Defendant's speech was slurred when Lopez asked Defendant why she was driving the wrong direction. *Id.* at 10:45:24–27. Likewise, Officer Hermann testified as to Defendant's slurred speech upon his arrival on the scene. *Id.* at 10:57:00–09.

Defendant admitted to consuming alcohol on the evening in question. *Id.* at 11:35:58–11:36:30. Notably, at the time, Defendant indicated to Officer Hermann that she was "under the influence of alcohol now," when asked at the PMO. Gov't Ex. 1. Indeed, in her testimony Defendant referred to her friend who took her to the barracks earlier in the evening as her designated driver.

Defendant refused to provide an adequate breath sample. Like the near collision, whether Defendant refused to provide a breath sample seems to be disputed, along with whether Defendant told officers she had asthma. Officer Keilb testified that Defendant eventually refused to blow into the breathalyzer after insufficient attempts. Defendant, however, testified that she tried to blow into the instrument four times, but did not decline to do so. Audio Tr. at 11:43:07–11:44:15. Defendant also testified that she told officers that she had asthma.

As noted above, Officer Keilb testified that Defendant asked no questions about the Intoximeter, that she indicated she understood Keilb's instructions and demonstration on providing a breath sample, and that she signed the consent form. *Id.* at 11:22:25–41. Keilb said that Defendant first puffed into the instrument, stopped, and puffed again, which was insufficient to produce a sample. *Id.* at 11:22:44–55. The instrument eventually timed out, and when Keilb asked Defendant to provide another sample, she seemed confused. *Id.* at 11:22:55–11:23:08. Keilb read the instructions again, Defendant kept waiting, and then the instrument timed out again. Keilb

13

again asked Defendant to provide a sample, but Defendant would not attempt to provide one. Keilb informed Defendant that refusing to blow into the instrument would mean that her driver's license would be suspended. Defendant said she understood. When Keilb asked again if Defendant wanted to provide a sample, Defendant shook her head, indicating "no." *Id.* at 11:23:23–55. Keilb said that Defendant did not inform him of any medical conditions. *Id.* at 11:23:58–11:25:23. Defendant, on the other hand, testified that she did not refuse to blow into the Intoximeter, that she attempted four times to provide a sample, and also that she told officers that she suffered from asthma. *Id.* at 11:43:07–11:44:15.

The court finds that Defendant refused to provide a sufficient breath sample. Regardless of whether Defendant "shook her head no" when asked to provide another sample, providing insufficient breath samples can be considered a refusal. *Naallah*, 2016 WL 1267164 at *2–3. Testimony showed that Defendant does have asthma and that asthma or similar conditions could possibly interfere with collecting a breath sample. *Id.* at 11:25:32–47. However, the court likewise heard that providing a breath sample is not difficult, that people with COPD, Pulmonary Fibrosis, and severe asthma should not have a problem providing one, and that Officer Hermann could provide an adequate sample himself, despite his having COPD and asthma. *Id.* at 11:25:32–47. Finally, the court heard that Defendant did not seem out of breath or to have difficulty breathing at the PMO. *Id.* at 11:26:06–53. Notably, at the PMO, Defendant answered the question "[d]o you have any physical defects" in the negative, on DD Form 1920. Gov't Ex. 1.

Finally, Defendant exhibited multiple clues on the SFSTs. Officer Hermann testified that Defendant exhibited two clues on the walk-and-turn test and exhibited one clue, twice, on the one-leg-stand test. On the walk-and-turn, Defendant did not correctly step by putting the heel of one foot to the toe of the other, and Defendant did not correctly turn. On the one-leg-stand, Defendant

14

twice put her foot down, instead of holding it six inches off the ground. Audio Tr. at 11:04:44–11:05:48. Again, Hermann testified that Defendant asked no questions about the tests, and that he demonstrated the tests.

The above evidence shows that Defendant, beyond a reasonable doubt, on the date alleged, February 28, 2021, drove a vehicle upon a street while under the influence of an impairing substance.

In *Naallah*, the court found that sufficient evidence existed for DWI where the defendant approached the inspection gate at a rate of speed higher than most cars, had bloodshot, watery eyes, had a strong odor of alcohol, the odor became stronger when he spoke, he admitted to drinking that evening, he lost balance during the SFTs, he failed to follow instructions on the SFTs, and he refused to take the breathalyzer test. *Naallah*, 2016 WL 1267164, at *4. Similarly, here, Defendant exhibited poor driving—driving the wrong way on Holcomb Boulevard—she had bloodshot, watery, and glassy eyes, and had to put her foot down twice on the one-leg-stand test, as noted above, in addition to the other factors showing impairment—slurred speech, admission of drinking, and refusal to provide a breath sample. Without the HGN test, Defendant only exhibited three clues on the SFSTs, but the court finds the government's evidence sufficient to prove the elements of the offense when combined with the other factors noted above.

North Carolina courts have upheld impaired driving convictions under similar circumstances. *Naallah*, 2016 WL 1267164, at *4 (citing *State v. Rhodes*, No. COA 12–1143, 227 N.C. App 651, 2013 WL 2407161, at *3 (N.C. Ct. App. June 4, 2013) (unpublished) (finding no error in the defendant's conviction of DWI where the defendant smelled of alcohol, admitted to drinking alcohol the night before, had bloodshot eyes and slurred speech, was unsteady on her feet, could not follow field sobriety test instructions, and refused to take an intoxilyzer test); *State v.*

*Gregory*, 154 N.C. App. 718, 721, 572 S.E.2d 838, 840 (2002) (upholding DWI conviction where the defendant was speeding, abruptly changed lanes without signaling, slammed on his brakes, smelled of alcohol, staggered while walking, admitted to drinking alcohol prior to driving, had slurred speech, and refused to submit to a breathalyzer test)).

Accordingly, the court finds that on February 28, 2021, (1) Defendant was driving a vehicle, (2) Defendant was driving the vehicle on a street, highway, or public vehicular area, as defined by N.C. Gen. Stat. § 20-4.01(13), (32), (46), in an area in North Carolina within the special maritime and territorial jurisdiction of the United States, as defined by 18 U.S.C. § 7(3), namely Marine Corps Base Camp Lejeune, (3) Defendant was driving the vehicle while under the influence of an impairing substance, and (4) Defendant is guilty of the offense of impaired driving as charged, in violation of N.C. Gen. Stat. § 20-138.1, as assimilated by 18 U.S.C. § 13(a).

## IV. CONCLUSION

For the reasons stated herein, the court finds Defendant guilty of the offense of impaired driving as charged, in violation of N.C. Gen. Stat. § 20-138.1, as assimilated by 18 U.S.C. § 13(a).

Defendant shall appear at the United States District Court in Wilmington, North Carolina on Thursday, February 3, 2022 at 10:00 a.m. for her sentencing hearing.

So ordered, the 28 day of December 2021.

Robert B. Jones, Jr.
United States Magistrate Judge

16